OPINION OF THE COURT
Dan Lamont, J.
Petitioners bring this CPLR article 78 proceeding seeking an order and judgment: (1) vacating, voiding, and annulling the new emergency regulation 18 NYCRR 486.5 (a) (4) (v) (new emergency regulation); (b) staying the respondent from enforcing any provision of the new emergency regulation; and (c) granting such other and further relief which the court deems just and proper, including the costs and disbursements of this proceeding. The enforcement of the new emergency regulation has been temporarily stayed during the pendency of this proceeding.
The respondent has filed an answer and a notice of motion to dismiss asserting the following objections in point of law: (1) the petition fails to state a cause of action; (2) the petitioners lack standing to litigate the claims presented; and (3) the is *545 sues raised by the petitioner are not ripe for judicial review. The petitioners have filed reply papers in opposition to the respondent’s motion to dismiss.
Background
The respondent has licensing, regulatory and enforcement jurisdiction over adult care facilities. Respondent’s investigators visit adult care facilities and prepare reports, and then administrative hearings are conducted regarding any alleged rule violations. If violations are found after an administrative evidentiary hearing, a variety of sanctions may be imposed against the violator. Some violations are curable within a 30-day rectification period in order to avoid a civil penalty — which is only imposed if the violation continues beyond 30 days (see, Social Services Law § 460-d [7] [b] [1]; 18 NYCRR 486.5 [a] [3]). The statutory rule and regulatory framework also provide for penalties for various types of violations which are not allowed a 30-day rectification period before a civil penalty can be assessed — including violations for “systemic practices and procedures” (see, Social Services Law § 460-d [7] [b] [2] [i]-[iv], as amended by L 1994, ch 733, § 4).
Respondent contends that over the past several months, the Department of Health has become aware of acute failures within the adult care facility industry to remedy systemic deficiencies and has also become aware of failures by adult homes to comply with Social Services Law § 461-m — requiring the report of a resident’s death, attempted suicide, or involvement with alleged felonies.
On May 3, 2002, the respondent issued an emergency regulation, 18 NYCRR 486.5 (a) (4) (v) — pursuant to Social Services Law § 460-d (7) and State Administrative Procedure Act § 202 (6). The new emergency regulation increases fines upon adult homes and defines the term “systemic practices and procedures” for violations — the prompt correction of which will not abate a civil penalty. Respondent contends that the new emergency regulation has two elements which must be met before such regulation can be invoked: (1) the violation must have resulted in harm to or endangerment of a resident, and (2) there must be a failure of systemic practices and procedures as demonstrated by a pattern of noncompliance or an inability to bring a specific area of facility operation into compliance with specific regulatory provisions. Respondent further contends that this new emergency regulation is necessary to provide an incentive to operators to avoid deficiencies — which incentive did not heretofore exist.
*546 The respondent explained the new emergency regulation in the State Register as follows:
“These regulations establish protections for these residents by permitting the department to expedite the enforcement process against facilities that endanger or cause harm to residents. Recent surveys conducted at a significant number of adult care facilities by officials from the Department of Health Commission on Quality of Care for the Mentally Disabled and the Office of Mental Health have confirmed that unsanitary and dangerous conditions have existed at some of these facilities for a sustained period of time and that operators have failed to report attempted suicides, deaths and serious crimes by or against residents. Current regulations permit the operators of these facilities to correct these regulatory violations within 30 days of being cited by the Department and avoid all civil penalties. This new rule would permit the Department to impose civil penalties, after hearing, even though a violation has been corrected, in cases where the violation is a failure in systemic practices and procedures which endangered or caused harm to a resident or when an operator fails to report an attempted suicide or death of a resident, thereby preventing the department and CQC from investigating the occurrence and surrounding circumstances. Delay in these investigations endangers the health, safety and welfare of facility residents. This rule will ensure that facilities are maintained in a much safer and more sanitary condition, that resident deaths, attempted suicides and felonies are reported and investigated promptly and that residents are much better protected than under current regulations. The rule will also ensure that facility operators are more accountable and responsible for the life, health, safety, and welfare of these vulnerable residents by requiring operators to maintain their facilities consistently in a manner which assures resident safety and protection. Without this new rule, as confirmed by recent surveys, some operators have permitted their facilities to deteriorate to a point where dangerous conditions exist. These surveys have also confirmed that only after State officials conduct on-site surveys are corrections made. With the avail *547 ability of substantial civil penalties, this new rule will require operators to maintain safe and sanitary conditions at all times.”
The respondent explained the reasons for adopting the new emergency regulation on an emergency basis by stating the following in the State Register:
“Compliance with the requirements of the State Administrative Procedure Act for filing of a regulation on a non-emergency basis including the requirement for a period of time for public comment cannot be met because to do so would be detrimental to the health and general welfare of the frail, disabled, and functionally impaired residents of these facilities and also would permit public funds to be expended for maintaining conditions that are both dangerous and unhealthy. As outlined above, the conditions in some of these facilities remain dangerous and unhealthy for extended periods of time. Recent surveys conducted by three separate State agencies have confirmed these conditions and emphasized the need for immediate Department action to assure that residents of these facilities are safe and protected from unhealthy and dangerous conditions and that reports of resident deaths or attempted suicides and felonies committed by or against residents are promptly reported to the Department of Health, CQC and law enforcement authorities so these incidents can be investigated promptly. Without this emergency regulation some operators will simply maintain the status quo and refuse to maintain consistently safe and healthy environments for their vulnerable residents.”
Petitioners contend that no emergency situation exists; that the regulation exceeds the respondent’s statutory authority; and that the respondent’s adoption of the new emergency regulation was in response to a three-part article published in the New York Times which was critical of the respondent’s oversight of adult care facilities. The definition of “systemic practices and procedures” adopted in the new emergency regulation is substantially similar to the definition in the respondent’s earlier emergency regulation which the New York Supreme Court temporarily enjoined less than a year ago. Respondent contends that the earlier regulation was allowed to lapse based upon the mistaken belief that the Supreme Court’s stay prohibited an extension of such regulation. The new emer *548 gency regulation also requires a facility to report, within 24 hours, any death, attempted suicide or alleged felony involving any of its residents.
On June 5, 2002, the respondent published a notice of proposed rulemaking in the New York State Register — which would thereby subject the contents of the new emergency rule to the State Administrative Procedure Act’s formal rule-making requirements.
Standing
The respondent contends that the petitioners do not have standing to challenge the promulgation of the new emergency regulation. The issue of standing “presents some knotty conceptual issues and is litigated with regularity” (Borchers and Markell, New York State Administrative Procedure and Practice, ch 7, § 7.2, at 185). “The standing of a party to seek judicial review of a particular claim or controversy is a threshold matter which, once questioned, should ordinarily be resolved by the court before the merits are reached” (Matter of Hoston v New York State Dept. of Health, 203 AD2d 826, 827 [3d Dept 1994], citing Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 769 [1991]; Matter of New York State Nurses Assn. v Axelrod, 152 AD2d 888, 890 [3d Dept 1989]).
“A party does not have standing to contest an administrative determination unless he or she has in fact been injured by the decision. Moreover, to confer standing, the injury must fall within the ‘zone of interests’ that the pertinent statute aims to protect or promote (see, Society of Plastics Indus. v County of Suffolk, supra, at 772-773), and it must be different in degree or kind from that suffered by the general public (see, Matter of Sheehan v Ambach, 136 AD2d 25, 28, lv denied 72 NY2d 804)” (Matter of Hoston v New York State Dept. of Health, supra at 827). Where organizations seek standing to challenge administrative agency actions, there must exist concrete adversarial interests requiring judicial intervention (see, Rudder v Pataki, 93 NY2d 273 [1999]). An organizational plaintiff must demonstrate a harmful effect on at least one of its members; it must show that the interests it asserts are germane to its purposes so as to satisfy the court that it is an appropriate representative of those interests; and it must establish that the case would not require the participation of individual members (Society of Plastics Indus. v County of Suffolk, supra).
In Matter of Dental Socy. of State of N.Y. v Carey (61 NY2d 330 [1984]), the Court of Appeals held that individual dentists *549 had standing to challenge Medicaid reimbursement schedules for dental care and that the Dental Society had standing based upon dentists’ common “professional interest” in adequate dental reimbursement. Likewise, the Third Department has liberally construed the zone of interest test in granting organizational standing (see, e.g., Matter of New York State Conference of Blue Cross & Blue Shield Plans v Muhl, 253 AD2d 158 [3d Dept 1999], lv denied 93 NY2d 807 [1999]; Matter of New York State Nurses Assn. v Axelrod, 152 AD2d 888 [3d Dept 1989]; but see, contra Matter of New York State Assn. of Criminal Defense Lawyers v Kaye, 269 AD2d 14 [3d Dept 2000], affd on other grounds 96 NY2d 512 [2001]).
More recently, the Court of Appeals granted standing to attorneys who represented indigent defendants in capital cases and wrote the following:
“[W]hile the universe of potential plaintiffs must be circumscribed in order to avoid misuse of legal challenges to administrative actions, we must preserve access to the courts for those who have been wrongly injured by administrative action (or inaction) directly flowing from statutory authority. Plaintiffs here are within that category.” (Mahoney v Pataki, 98 NY2d 45, 52 [2002].)
Petitioners assert that following the promulgation of the new emergency rule, the respondent and other state agencies have conducted inspections aimed at identifying violations and have retroactively cited an adult home for violating the reporting provisions of the new emergency rule. Respondent’s papers in support of her motion to dismiss indicate that the results of these inspections have uncovered “widespread systemic deficiencies” in some adult homes. This court holds and determines that an individual member of the association has suffered an injury in fact by virtue of actually being cited with a violation and because the entire industry is presently faced with the threat of enforcement of the new emergency regulation — specifically including those facilities to which the respondent has referred as containing “widespread systemic deficiencies” (see, Matter of Brodsky v Zagata, 165 Misc 2d 510 [Sup Ct, Albany County 1995]).
This court holds and determines that the primary zone of interest created by the Legislature in enacting Social Services Law § 460-d is the protection of the residents of the adult homes. However, this court must also hold and determine that the petitioner association and its individual members also fall *550 within the zone of interests in the statute. The Legislature clearly provided a mechanism for the protection of the adult home residents, but at the same time provided the adult homes an opportunity to cure any deficiencies before being subjected to a civil penalty. Even though the goals of the association may also include advancing the interests of the adult home residents, this court holds and determines that the petitioner association still has standing since part of the petition seeks a clearer definition of “systemic practices and procedures” which could arguably benefit the residents by giving the adult homes a better understanding of what the agency will consider a pattern or an inability to comply with various regulations. Assuming arguendo that the dual interest of the association negates its standing, this court holds and determines that the individual petitioners still have standing to contest the new emergency regulation which unquestionably has an industry-wide effect upon them and subjects them to new potential civil penalties (Mahoney v Pataki, supra).
Ripeness
The respondent’s contention that this proceeding is not ripe is without merit. One of the individual petitioners is currently being cited for a violation of a portion of the new emergency regulation. Furthermore, to delay the hearing of the petitioners’ claims regarding respondent’s alleged violation of the State Administrative Procedure Act would render the emergency regulation itself effectively unchallengeable. The respondent has proceeded with the normal formal rule-making procedures under the State Administrative Procedure Act by filing a notice on June 5, 2002. The court would expect a new regulation in the very near future under the normal State Administrative Procedure Act procedures.
State Administrative Procedure Act
The petitioners contend that the respondent violated the State Administrative Procedure Act by enacting the new emergency regulation on an emergency basis. State Administrative Procedure Act § 202 (6), in pertinent part, states:
“Notice of emergency adoption, (a) Notwithstanding any other provision of law, if an agency finds that the immediate adoption of a rule is necessary for the preservation of the public health, safety or general welfare and that compliance with the requirements of subdivision one of this section *551 would be contrary to the public interest, the agency may dispense with all or part of such requirements and adopt the rule on an emergency basis.”
Petitioners’ most compelling arguments in opposition to respondent’s adoption of the new emergency rule on an emergency basis are: (1) that respondent has failed to promulgate regulations for a period of approximately eight years under normal State Administrative Procedure Act procedures; (2) that respondent has failed to adopt regulations under the normal State Administrative Procedure Act procedures following the stay issued by New York Supreme Court of a similar emergency regulation last year; and (3) that respondent has failed to sufficiently justify emergency action.
State Administrative Procedure Act § 202 (6) (d) (iv) provides that a notice of emergency adoption shall:
“contain the findings required by paragraphs (a) and (c) of this subdivision and include a statement fully describing the specific reasons for such findings and the facts and circumstances on which such findings are based. Such statement shall include, at a minimum, a description of the nature and, if applicable, location of the public health, safety or general welfare need requiring adoption of the rule on an emergency basis; a description of the cause, consequences, and expected duration of such need; an explanation of why compliance with the requirements of subdivision one of this section would be contrary to the public interest; and an explanation of why the current circumstance necessitates that the public and interested parties be given less than the minimum period for notice and comment provided for in subdivision one of this section.”
The respondent’s reasons for adopting an emergency rule rather than a rule through the normal State Administrative Procedure Act procedures of notice and comment include: (1) that compliance with the State Administrative Procedure Act is not possible “because to do so would be detrimental to the health and general welfare of the frail, disabled, and functionally impaired residents of these facilities and would also permit public funds to be expended for maintaining conditions that are both dangerous and unhealthy”; (2) that as outlined in the explanation of the new regulation, “the conditions in some of these facilities remain dangerous and unhealthy for an extended period of time”; (3) that recent surveys conducted by *552 three separate state agencies have confirmed the poor conditions and emphasize the need for immediate department action; and (4) that “without this emergency regulation some operators will simply maintain the status quo and refuse to maintain consistently safe and healthy environments for their vulnerable residents.”
If the failure to address an emergency situation were the touchstone as to whether or not such emergency actually exists, then this court would be constrained to uphold the petitioners’ contention; however, this court determines that any prolonged failure by respondent to take administrative action to protect and preserve the health, safety and welfare of patients in adult care facilities when conditions inimicable to their health, safety and welfare clearly exist does not mean that no emergency exists.
This court holds and determines that the respondent has clearly demonstrated: (1) that widespread systemic deficiencies exist in some adult care facilities; (2) that such widespread systemic deficiencies constitute a danger to the health and general welfare of the frail, disabled, and functionally impaired residents of such facilities; and (3) that immediate adoption of the new emergency regulation is necessary for the preservation of the public health, safety or general welfare of the residents of some adult care facilities. Accordingly, this court further holds and determines that the respondent’s adoption of the new emergency regulation to investigate and correct widespread systemic deficiencies in the adult care facility industry for the preservation of the public health, safety and general welfare of the frail, disabled, and functionally impaired residents of these facilities on an emergency basis does not violate the State Administrative Procedure Act.
New Emergency Regulation
Petitioners contend that the respondent exceeded the Department of Health’s statutory authority because the definition of “systemic practices and procedures” includes all or substantially all of the operating requirements imposed upon operators of adult care facilities and upsets the statutory balance created by the Legislature in Social Services Law § 460-d (7) (b) which provides adult care facilities with an opportunity to rectify violations without paying a civil penalty. To the extent that petitioners request a declaratory judgment, the court hereby converts that portion of the petition to a declaratory judgment action (see, CPLR 103 [c]).
*553 This court holds and determines that the petitioners’ contention that the Department of Health exceeded its statutory authority in promulgating the new emergency regulation is without merit. In enacting Social Services Law § 460-d (7) (b), the Legislature provided that the 30-day rectification period would not be applicable to certain enumerated violations that endangered or resulted in harm to any resident — including the failure in systemic practices and procedures. The Legislature left the implementation and definition of systemic practices and procedures to the administrative agency. The new emergency regulation, 18 NYCRR 486.5 (a) (4) (v), states:
“the failure in systemic practices and procedures as evidenced by a pattern of violations or an inability to bring a specific area of facility operation into compliance with sections 487.4, 487.5, 487.6, 487.7, 487.8, 487.9(a)(1), (3), (7), (8), (10)-(15), (b)-(d), (f) (g)(1), 487.10(a)-(b), 487.11, 487.12(b), (g)-(j), 488.4, 488.5, 488.6, 488.7, 488.8, 488.9(a)(1), (2), (4), (5), (7)-(ll), (b)-(e), 488.10(a)-(b), 488.11, 488.12(b)-(c), (g)-(i), (1), 490.4, 490.5, 490.6, 490.7, 490.8, 490.9(a)(1), (3), (5), (6), (8)-(13), (b)-(d), (f), 490.10(a)-(b), 490.11, 490.12(b) or (g)-(j).”
While the new emergency regulation contains multiple references to regulations where a single violation could previously be cured within the 30-day rectification period to avoid any civil penalty, the new emergency regulation provides that a violation of one of those very same regulations must have resulted in harm to or endangerment of a resident and be a part of a pattern of violations or an inability to bring a specific area of a facility operation into compliance with those sections in order for the respondent to impose a penalty and deny any rectification period to avoid such penalty. The respondent’s implementation and definition of what constitutes a failure in systemic practices and procedures was clearly left in the hands of the administrative agency by the Legislature in 1994 {see, Social Services Law § 460-d [7] [b] [2] [iii]). The respondent clearly has the jurisdiction to define “systemic practices and procedures” by virtue of Social Services Law §§ 460-d and 461-m, and any contention to the contrary is simply without merit.
The petitioners further contend that the respondent’s interpretation of a failure in “systemic practices and procedures” is overly broad, arbitrary and capricious and lacks a rational basis. Petitioners’ arguments overlook and minimize the *554 regulatory language that requires that violations of the various regulations be a pattern of violations or an inability to bring a specific area of a facility operation into compliance with those sections. The respondent concedes that a violation of one of these sections on an individual or isolated basis is not serious.
In general, reviewing courts defer to the interpretation accorded a statute by the enforcing agency, and provide that interpretation great weight and deference, unless it is irrational, unreasonable or inconsistent with the governing statute (see, Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 62 NY2d 539 [1984]). The respondent contends that the new emergency regulation seeks to concentrate nonrectifiable civil penalties against adult homes with aggregations of deficiencies which, by their compound and continuous nature, produce substandard living conditions. This court holds and determines that the respondent has sufficiently stated a reasonable and rational basis in support of the promulgation of the new emergency regulation (see, Matter of Pell v Board of Educ., 34 NY2d 222, 231 [1974]) and this court will not interfere with the agency’s definition, interpretation and implementation of Social Services Law § 460-d (7) (b) (2) (iii). The petitioners’ contention that the regulation is arbitrary because it duplicates enforcement powers that the agency already has is entirely without merit. The regulation language: “a pattern of violations or an inability to bring a specific area of a facility operation into compliance with those sections” does not create an overly vague regulation. Those terms have their ordinary meaning, and the respondent agency may apply such terms to the particular facts on a case-by-case basis in its administrative hearings.
Petitioners’ contentions regarding the tightening of reporting requirements for resident deaths, suicides and their involvement in felonies is similarly unavailing. The respondent is finally promulgating regulations that enforce Social Services Law § 461-m. This court finds ludicrous the petitioners’ contention that respondent’s interpretation providing that adult homes report any and all deaths of residents — regardless of whether the deaths occurred on or off their premises, or were the result of natural causes — somehow violative of petitioners’ rights. The petitioners have simply benefitted over the years from agency inaction in not requiring prompt and adequate reporting of deaths of residents. The ability to rectify a violation of the reporting requirements of this section within 30 days would eviscerate the timing of the reporting requirement in the statute in the first instance.
*555 Conclusion
This court holds and determines that the petition should be and the same is hereby denied and dismissed in all respects.